[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties to this action were married in Norwalk, Connecticut on December 6, 1992. This is a second marriage for both and the wife brought to the marriage a child from her previous union. This case has had a slow and tortuous history in the courts including the plaintiff's ("wife") filing of a bankruptcy and an appeal which was later withdrawn. The wife is 48 years old and in apparent good health. At the time the parties first met in July 1990, she was a self-employed computer broker. She has a Bachelor's Degree in Psychology as well as a Master's in Nutrition from CT Page 15906 the University of Bridgeport. She is currently employed as a nutritionist and teaches at the University of Bridgeport. The defendant ("husband") is 43 years old and has a law degree. In addition, he holds an MBA and is, as well, a CPA. He has for the most part worked as a practicing attorney and for a while was employed by the firm of Robinson Cole. He currently practices on his own. Over the course of two days, the court heard extensive testimony from both parties as well as Attorney Brian Kaligian who was called by the husband to testify with regard to the wife's bankruptcy.
When the parties first met in July of 1990, the wife was renting a home in Westport, the husband was renting in Greenwich. Sometime thereafter the husband moved in with the wife, however, within a short time they had to move and they began to look for a house of their own to purchase. The parties found a home at 68 Kings Highway North, in Westport, and they purchased same in October of 1991 (prior to their marriage) for the sum of $250,000. The husband contributed a down payment in the amount of $25,000 in cash, the wife's father invested the sum of $125,000, and the husband signed a promissory note to the wife to secure the $100,000 the balance of the purchase price. Due to the significant financial difficulties of the wife's previous husband, title to the property was initially taken at that time in the name of the husband and the wife's father. The parties moved into the home and, over the course of time, proceeded to make significant improvements, including a large addition with a new kitchen. These improvements were paid for in part with an additional $20,000 cash from the wife, some legal fees received by the husband totaling $55,000, and to a significant extent through barter arrangements made by both parties, but mostly by the husband. The husband claims that his barter arrangements totaled a further $125,000. The evidence does not fully support this figure.
From middle to late 1992, the parties negotiated a pre-nuptial agreement (hereinafter "Agreement"). The language was drafted by the husband and the Agreement was finalized on December 5, 1992, one day prior to their marriage. In the event of a dissolution of marriage, Article 10.4 of the original agreement provided inter alia the following:
 1. "Richard agrees to reimburse Barbara $100,000.00 promissory note upon sale of the house";
 2. "Barbara agrees that the monthly interest payments on the Note will be considered her contribution towards the household living expenses, clothes, auto expense, taxes on house, entertainment, etc," and
CT Page 15907
 3. "The remaining proceeds, net of broker's commission, closing expenses, including attorney's fees, conveyances and taxes, shall be divided equally."
The parties did not leave it at that, and they inserted a handwritten amendment to the second paragraph of that article which read in part that,"The parties agree that Richard is to receive $25,000 upon the saleand Barbara is then to receive $125,000, as return of their respectivecontributions."
One year later, on December 5, 1993, the parties amended the prenuptial agreement not only so as to reflect their respective additional contributions to the improvements to the home, but also to, in their words, protect each of the parties' contributions. In part, the amendment increases their respective shares to a base of $145,000 for the wife and $180,000 for the husband. In addition, a handwritten amendment modifies the language of the fourth full paragraph and provides that the $100,000 loan to the wife is an obligation of the husband "which is to be repaidfrom Richard's share of the proceeds of the house," thus reducing his share. Interest on the loan was not to be paid by the husband, but rather treated as a credit toward the wife's contribution to the household expenses. That is, until such time as an action for dissolution of marriage was begun, and in that event interest was to run from date of service of process. Finally, the parties made crystal clear that the Amendment "does not change any other provision of the Agreement datedDecember 5, 1992. All of the other provisions thereto shall remainunchanged."
In December of 1994, the wife filed bankruptcy and was represented in part by her husband as well as Attorney Ira Charmoy. She received a discharge in bankruptcy in March of 1995, however, sometime later the husband, on his own initiative, reopened the bankruptcy because he felt that there was a possibility that a fraud had been committed upon the court. Upon review and investigation, the Trustee waived further claim to any assets, and the wife's previous discharge was upheld. At a later time, the wife's father transferred his interest in the house to her. The house was later sold by agreement of the parties, and the proceeds continue to be held in escrow. These funds, currently amounting to approximately $550,000, are the primary object of the dispute between the parties.
Both parties testified at some length regarding their respective contributions. The husband also claims that he reduced the family debt by between $25,000 and $30,000, and that the wife retained all the family CT Page 15908 furniture acquired during the marriage when she left at the time of their separation.
Neither party contends that the prenuptial agreement they entered into was invalid. The wife has asked the court to enforce the prenuptial agreement and the first amendment thereto, and in addition, to award her attorney's fees as a result of what she asserts to be the husband's failed attack upon the enforceability of that agreement. By the same token, the husband contends that it would be inequitable to enforce the otherwise valid agreement due to the significance of his contributions toward the improvements to the house subsequent to the first amendment to the prenuptial agreement, an agreement which, the court notes, was drafted by him. The court also notes that no further writing was introduced at the hearing, by either party, which modified the pre-nuptial agreement as amended. In response to a question on this point, the husband testified that he and his wife were "getting along and he didn't think they needed to do it." The husband offered testimony that the wife forgave the husband of his obligation for the $100,000 loan as it was part of her "dowry." Moreover, he claims that her forgiveness should operate as a substantial change of circumstances. The court does not find the husband's testimony credible on this point. Both parties have filed legal briefs with regard to the issue of the enforceability of the prenuptial agreement.
The wife testified that the cause of the breakdown of the marriage was due to the husband's "inability to establish a good relationship with her son," as well as the husband's "obsessive compulsive behavior which interfered with their ability to live together." The husband described himself as "organized." In point of fact, the primary focus of both of the parties throughout these proceedings has been the disposition of the net proceeds from the sale of the marital home.
 LAW
The questions presented to the court are twofold. The first is whether or not, upon dissolution of marriage, it is equitable to enforce a prenuptial agreement, valid when executed, where one party demonstrates that their financial contributions to a major family asset are so significant as to merit a second look on the theory that one party has been unjustly enriched? Secondly, should attorneys fees and costs be awarded to the party who successfully defends a challenge to the enforcement of the prenuptial agreement, where that agreement so provides?
Prenuptial Agreement:
CT Page 15909
Connecticut law regarding antenuptial[1] agreements was settled by the Connecticut Supreme Court in the matter of McHugh v. McHugh,181 Conn. 482 (1980).[2] In sum, where such an agreement is found to be valid when executed, the court takes a "second look" at the time of its proposed enforcement in order to determine whether or not it is equitable to enforce it. Here, both parties testified that the agreement which they entered into on December 5, 1992, and modified in writing on December 5, 1993, was a valid agreement. Thus the court moves to the second prong of the test to determine whether or not it is equitable to enforce it. The standard measure to be applied by the court is set forth at page 489 of the McHugh decision, to wit:
 ". . . an antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice."
An antenuptial agreement is to be construed in accordance with principles of construction applicable to contracts. The McHugh court went on to state that:
 "The basic purpose of construction is to ascertain and give effect to the intention of the parties. [citations omitted] Where there is no ambiguity, however, there is no occasion for construction and the agreement will be enforced as its terms direct."(page 491)
Again, neither party here contends that the basic Agreement or the amendment thereto made one year later are unclear or were entered into in anything but good faith. Both testified that the purpose of each instrument was to recognize to protect the contributions of each to the marital residence at that given point in time. Article 13.1 of the original Agreement itself provides that, "No change shall be made in anyof the provisions of this Agreement except by an instrument in writingduly executed by the parties hereto." The court attributes considerable weight to this factor, since no further amendment was entered into subsequent to the first amendment made on December 5, 1993.
Under ordinary circumstances, the basis of a challenge to the enforcement of a valid antenuptial agreement would be a significant change in the health or finances of a party after the execution of the agreement. Here, the husband seeks such a change on the basis of his significant monetary and non-monetary contributions to the real property subsequent to the date of the first amendment and its sale, much like a CT Page 15910 claim for unjust enrichment. A similar argument, however, was rejected by Judge Dranginnis in the case of Adler v. Adler, 6 C.S.C.R. 73 (Litchfield 1991). Furthermore, the court distinguishes the facts of this case from those of Siegel v. Siegel, 16 Conn.L.Rptr. No. 14, 450 (Stamford 1996), in particular, the ages of the parties, their ability to acquire assets in the future, and the fact that the husband stands to recover not only his initial investment in the house, but also a significant portion of the appreciation in value of the real estate. Perhaps more to the point, the husband has not fully sustained his burden of proof as to his additional contributions.
Attorneys Fees:
In general, an award of attorneys fees to one party in an action for dissolution requires the court to consider the factors set forth inSection 46b-62 of the Connecticut General Statutes to determine the respective financial abilities of the parties. However, where the parties have made provision for the payment of attorneys fees within the terms of their agreement, it is error to consider the financial ability of either, but rather, the court must rely "upon the relevant provisions of the separation agreement." Goold v. Goold, 11 Conn. App. 268, 287-88
(1987). The same principle should apply to antenuptial agreements.
FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, including the "Agreement" dated December 5, 1992 and "Amendment Number 1" thereto dated December 5, 1993, McHugh v. McHugh, 181 Conn. 482 (1980), as well as the factors enumerated in Sections 46b-40, 46b-51, 46b-62, 46b-81, and 46b-82 of the Connecticut General Statutes, hereby makes the following findings:
1. That it has jurisdiction.
2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown.
 4. That a certain prenuptial "Agreement" by and between the parties dated December 5, 1992, and as amended by a document entitled "Amendment Number 1 to Prenuptial" dated December 5, 1993, was validly executed, and that the court finds it to be fair and equitable under all the circumstances, orders CT Page 15911 that it be made part of court file, and incorporated in its decree by reference.
 5. That terms of said prenuptial agreement and the amendment thereto are clear and unambiguous and do not require clarification or interpretation.
 6. That the court does not find the husband's testimony regarding his claim that the wife waived the payment of the $100,000 promissory note to be credible.
 7. That the evidence does not fully support the husband's claim for an additional investment of $125,000 in the marital real estate from barter.
 8. That the Agreement of the parties provided, in part, that all amendments were to be in writing and executed with the same formality as the original, and that no further amendments to the Agreement were made subsequent to December 5, 1993.
 9. That the court recognizes that during the marriage both parties made significant monetary and non-monetary contributions to the acquisition, improvement, maintenance, and preservation of the marital estate, and that the husband's contributions to the improvement to the marital home since December 5, 1993, the date of the first amendment to the prenuptial agreement, while significant, were not outside the contemplation of the parties and no inequity would result from the strict enforcement of the prenuptial agreement as amended.
 10. That a Writ, Summons, and Complaint in the present action was served on January 28, 1998, and that under the terms of the Agreement, interest on the $100,000 promissory note began to run as of that date.
 11. That both parties are in generally good health and have a demonstrated earning capacity and an ability to support themselves, and that therefore, in spite of the length of the CT Page 15912 marriage, an award of periodic alimony to either is not warranted.
 12. That at the time of their separation in February 1998, in contravention of Articles 5.6 and 10.4 of the Agreement, the wife retained the jointly owned home furnishings acquired during the marriage, and, in addition, that the husband reduced the family indebtedness by approximately $30,000 (even though the debts were listed in name), and that as an offset, it would be equitable and appropriate for the wife pay to him the sum of $17,500.00 from her share of the net proceeds from the sale of the real estate, however, except for this sum, each party should be responsible for the debts as shown on their respective financial affidavits.
 13. That the wife has successfully defended the husband's challenge to the enforcement of the Agreement dated December 5, 1992, as amended December 5, 1993, in particular, Article 10.7 thereof, in that by his claims he has sought "to recover property in a manner which deviates from "its express terms," and he is therefore liable to the wife for her attorneys fees and "other expenses" incurred in this action.
 14. That the wife has incurred the sum of $17,501.00 in attorneys fees and costs per an affidavit of fees as on file, which is unchallenged, and which the court deems to be fair and reasonable, and that the husband should be responsible for his own attorneys fees and costs.
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
2. No alimony is awarded to either party.
 3. The proceeds from the sale of the marital residence located at 68 Kings Highway North, CT Page 15913 Westport, Connecticut, shall be divided in accordance with the Agreement of the parties dated December 5, 1992, and as amended December 5, 1993, to wit:
 A. The sum of $145,000 to the wife and $180,000 to the husband;
 B. Fifty (50%) Percent of the excess over $325,000 to each party;
 C. From the wife's share the sum of $17,500.00 (as set forth in 4. below) payable to the husband;
 D. From the husband's share the sum of $100,000, together with interest at the rate of 8% commencing January 28, 1998 until the principal balance of the promissory note shall be satisfied, payable to the wife; and
 E. From the husband's share the sum of $17,501.00 payable to the wife, as and for her attorneys fees and costs (as set forth in 5. below).
 4. As an offset to the husband's reduction of the family debt and to the wife's retention of family furnishings, the wife shall pay to the husband the sum of $17,500.00 from her share of the proceeds from the sale of the marital residence, thereafter, each party shall be responsible for the debts as shown on their respective financial affidavits.
 5. The husband shall pay to the wife the sum of $17,501.00 as and for her attorneys fees and costs from his share of the proceeds from the sale of the marital residence at the time of their disbursement, and that the husband shall be responsible for his own attorneys fees and costs incurred in this action.
 6. The wife shall promptly notify her employer as to the change of marital status and shall cooperate with the husband in obtaining continuation health insurance coverage as provided by state and federal law. The husband shall be responsible for the payment of any premiums due for such coverage CT Page 15914 if he elects to carry same.
THE COURT
SHAY, J.